SEXTON, Judge.
This is an appeal from a sustained motion to dismiss a suit for wrongful death damages. The suit was brought by Carolyn C. Fair on behalf of herself and her minor son Jeremy Lee Fair for the electrocution of her deceased husband Mickey Fair.
Mrs. Fair initially brought suit against Clyde Mullican, owner of the property upon which Mickey Fair was working at the time of his death, and The Black and Decker *187 Manufacturing Company, the manufacturer of the electric drill which Mr. Fair was using at the time of his death. Mrs. Fair released Black and Decker before trial,[1] and thus at trial, she was left to prosecute her claims against only defendant Mullican. On the trial, defendant Mullican moved for a dismissal after the close of plaintiff’s case in chief on the grounds that plaintiff had not established a cause of action against him. The trial court granted the motion, dismissing Mrs. Fair’s claims against Clyde Mullican at plaintiff’s costs. Mrs. Fair now appeals the trial court’s dismissal of her suit against Clyde Mullican. We affirm.
On August 1,1979, decedent Mickey Fair was employed by building contractor David Patton to help construct a metal barn for defendant Clyde Mullican, which Patton had contracted with Mullican to erect. The metal barn was being constructed on Mr. Mullican’s property and working with Mr. Fair on the project were Kenneth Mason, his father Tommy Mason, the job foreman, and Kenneth Mason’s uncle (unnamed in the record).
Prior to Mickey Fair’s death, he was laying and installing tin sheets on the roof of the metal barn with Kenneth Mason. Mr. Fair was using an electric Black and Decker drill to drill holes in the tin sheets and an electric impacter to bolt the tin sheets to the roof of the barn. At the end of the power drill’s cord was an electric plug which was two-pronged rather than three-pronged; the plug on the end of the drill’s electric cord was absent a ground prong and the drill was thus devoid of a “ground connection.” There were at least two extension cords connecting the power drill’s cord and two-pronged plug with the electrical outlet. The outlet or electrical receptacle into which the extension cord was plugged was owned by Mr. Mullican and located on a small storage shed on his property.[2] This was a two-holed receptacle or outlet and thus did not permit the insertion of a three-pronged or “grounded” electrical plug or cord.
Shortly before the fatal accident, the electric drill — then used by Mickey Fair— began “shorting out.” Mr. Fair then handed the drill down off the roof to Tommy Mason and his brother who were working at ground level. Tommy Mason briefly “repaired” the power drill, tested it, and handed it back to Mickey Fair, atop the building. Kenneth Mason plugged the drill’s cord back in, and Mr. Fair resumed using the drill to install the tin sheets. Mr. Fair thereafter went to the peak of the roof to assist Kenneth Mason bolt down a piece of tin that was particularly troublesome for Mason to install. In the course of assisting Mason, Mr. Fair pressed the trigger of the electric drill and the drill, in the words of Kenneth Mason, “shorted out.”
The sequence of events which next ensued occurred at approximately 12:30 p.m., and is best characterized by Kenneth Mason’s trial testimony:
“[A]s soon as it hit him, he ... he hollered one time and I knew what happened and I hollered and they unplugged it. He, you know, wasn’t in it but just a few seconds, and then he ... he was right on the edge of the building and he started rolling off, you know. We was right in the middle of the building and he rolled off and I grabbed his leg, but he was pretty good size and he liked to pulled me off the building. My father caught his head and shoulders before he hit the ground. His head never did hit.”
Defendant Clyde Mullican immediately carried Mickey Fair to the hospital in the cab of his pickup, but it appears from the record that Mr. Fair had died at the scene of the accident.
*188 It was established at the trial that the apparent short circuiting of the power drill was caused by the contact of an exposed electrical conductor inside the drill’s casing with the drill casing itself. According to electrical engineer John Tucker, “a black conductor from the switch that goes to the motor [was] imbedded in the metallic part of the drill and the copper [was] exposed and it was actually touching the drill case .... ” Mr. Tucker reached the conclusion that the short circuiting was caused by the exposed conductor by testing the electric charge present in the drill casing before and after the exposed part was covered with electrical tape.
Plaintiff’s claim against the sole remaining defendant Mullican, at the trial level, was alternatively based on defendant’s negligence and strict liability. The essence of the negligence claim is that defendant had acted unreasonably, under LSA-C.C. Art. 2316, in inviting the presence of construction workers and the use of electrical tools while only affording two-holed electrical outlets for their use. The substance of the strict liability allegation was that defendant was the owner and thus the custodian of a defective and unreasonably dangerous “thing” — the two-holed electrical outlet— and was therefore strictly liable under the principles of LSA-C.C. Art. 2317.
Negligence and strict liability for things in one’s custody are, of course, definitionally distinct. “Negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm. It is a departure from the conduct expectable of a reasonably prudent man under like circumstances.” Pence v. Ketchum, 326 So.2d 831, 835 (La.1976). While negligence is unreasonable conduct, the liability emanating from LSA-C.C. Art. 2317 is based upon a defendant’s care or custody of a thing which causes damages because it is defective or unreasonably dangerous. “[T]he liability of the guardian of a thing for damages caused through the vice or defect of the thing has been interpreted as providing for liability of the guardian without personal negligence on his part, his legal fault ... being based upon the breach of his legal obligation to keep his thing in such condition or in such control that it does no damage to others.” Loescher v. Parr, 324 So.2d 441, 447-48 (La.1975) (emphasis added).
While there is thus a distinct conceptual foundation underlying each theory of recovery, plaintiff cannot succeed under either unless causation is established. Under a negligence theory, the unreasonable act must cause the damages of which plaintiff complains. Under LSA-C.C. Art. 2317 genre of strict liability, the unreasonably dangerous thing must have caused plaintiff’s damages. Hebert v. Maryland Casualty Co., 366 So.2d 1044 (La.App. 1st Cir. 1978); Stevens v. Richardson, 156 So. 779 (La.App. 1st Cir.1934).
The linchpin of both tort allegations is plaintiff’s contention that Mullican caused Mr. Fair’s death by affording only a two-holed electrical outlet to the construction workers erecting the metal barn on his property.[3] Plaintiff’s reasoning is as follows: Mullican’s two-holed receptacles precluded the use of a three-pronged or “grounded” electrical plug since a three-pronged plug can simply not be inserted into a two-holed receptacle. Because the use of a grounded plug was precluded, a grounded and continuous electrical circuit could simply not exist. An unbroken and circular electrical flow was made an impossibility, and electricity could therefore not achieve a return flow from the power drill to a grounded electrical source.
Plaintiff’s reasoning is sound as far as it goes, however it simply does not proceed far enough to resolve the pivotal factual question which is at the crux of this case. A careful analysis of the facts of this case *189 reveals that the two-holed receptacle owned by defendant Clyde Mullican and used by Mickey Pair did not cause decedent’s death.
We reach this conclusion because the third or “ground” prong normally present on the plug of the electric drill’s cord had been cut off.[4] Without this ground prong or “bridge”, the electricity present in the casing could not achieve a reverse flow through the plug, and could not reach or return to the extension cord to which the plug was connected. The ground wire present in the extension cord was thus rendered ineffective for transmitting electricity back to the “ground.” In short, the absence of a ground prong on the plug of the electric drill’s cord effectively severed the circular continuity of the electrical circuit and prevented the return flow of electricity from the drill to the outlet. The removal of the ground prong normally present on the plug of the drill’s cord irretrievably destroyed the “grounded” connection.
Because of the ground prong’s absence, the electricity in the casing could not have achieved a return flow to the outlet even if a three-holed receptacle would have been made available. Thus, Clyde Mullican’s two-holed receptacle did not cause the electrocution. The electrocution would have occurred even if a two-holed receptacle had not been utilized. Because of the fatal absence of a three-pronged plug Mickey Fair would have died even if a three-holed receptacle had been provided by Clyde Mul-lican.
This causal fact was amply developed by the testimony of electrical engineer John C. Tucker, plaintiffs witness who was accepted on the trial as a qualified expert:
Q. In other words, with that ground prong missing, the accident would still have happened?
A. That is correct.
Q. The ground prong on the drill?
A. That’s correct. That removed the case ground.
Q. So that even if the electrical outlet had been grounded, the accident would still have occurred?
A. In my opinion it would have.
The trial court denied recovery. Based upon our factual finding that Clyde Mulli-can’s two-holed receptacle did not cause decedent’s electrocution, we uphold the trial court. Accordingly, the trial court’s judgment is affirmed at plaintiff’s costs.
AFFIRMED.

. Black and Decker only remained a party to the litigation insofar as a third party demand was filed by defendant Mullican against Black and Decker for any amounts for which Mulli-can might be adjudged liable to plaintiff. The importance of Mullican’s third party demand, however, is mooted by the resolution of this appeal.

. Although there was some uncertainty as to precisely which outlet was being used at the time of decedent’s death, there is little genuine doubt that the outlet was owned by Mr. Mulli-can, that the outlet was located on Mr. Mulli-can’s storage shed, and that the outlets located on Mr. Mullican’s storage shed were two-holed, rather than three-holed receptacles.

. We have serious doubts that a homeowner has a “duty” to protect a repairman called to the premises from being electrocuted by that repairman’s faulty equipment as a result of not having grounded receptacles. Does and/or should the average homeowner have the necessary knowledge of electrical forces? However, obviously our analysis in this cause precludes the necessity of a discussion of this subject.

. We are in no wise unaware that our analysis and determination could be entirely transformed if the evidence established that the ground prong of the drill’s cord plug was “cut off” in response to the workers’ discovery that the available outlets were two-holed. If this were the case, the two-holed receptacle could still be said to have caused the electrocution by impelling the workers to remove the ground prong and thus destroy the ground connection. However, plaintiff did not establish this. Indeed, it appears, although the testimony is not unequivocal in this respect, that the ground prong was removed prior to, and not in response to, the workers’ discovery that the receptacles were two-holed.