385 So.2d 849 (1980)
Ivy BABIN
v.
ST. PAUL FIRE AND MARINE INSURANCE COMPANY et al.
No. 13307.
Court of Appeal of Louisiana, First Circuit.
May 5, 1980.
*851 Jack M. Dampf, Baton Rouge, for plaintiff-appellant Ivy Babin.
Donald S. Zuber, Baton Rouge, for defendants-appellees St. Paul Fire & Marine Ins. Co., Steven N. Abramson, M. D., and Richard A. Streb, M. D.
Ben Lightfoot and Roger M. Fritchie, Baton Rouge, for defendants-appellees East Ascension General Hospital and Insurance Co. of North America.
Before COVINGTON, LOTTINGER and COLE, JJ.
COVINGTON, Judge.
Plaintiff, Ivy Babin, brought this suit for damages based upon the alleged malpractice of the operating general surgeon, Dr. Steven M. Abramson. Joined as defendants with Dr. Abramson were Abramson-Streb, a professional medical corporation of which Dr. Abramson was a member, and their liability insurer, St. Paul Fire and Marine Insurance Company. The plaintiff also sued East Ascension Parish General Hospital and its liability insurer, Insurance Company of North America, for alleged negligent acts.
Following trial by jury and the response of the jury to interrogatories, verdict was entered for all defendants, denying plaintiff's claim for damages. Judgment on the verdict was signed by the trial judge. Plaintiff's motion for new trial was denied. The plaintiff has devolutively appealed. We affirm.
A jury verdict should be maintained unless the record reflects that its conclusions of fact are not supported by the evidence, and/or its application of law is clearly erroneous. Perrin v. St. Paul Fire and Marine Insurance Company, 340 So.2d 421 (La.App. 4 Cir. 1976). In the absence of manifest error, the appellate court is not to disturb the finding of the jury which has evidence before it furnishing a reasonable factual basis for its verdict, based upon its reasonable evaluation of credibility. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973); Busby v. St. Paul Fire & Marine Insurance Company, 290 So.2d 701 (La.App. 1 Cir. 1974), writ denied, 294 So.2d 546 (La.1974).
In the instant case, the jury answered an interrogatory that Dr. Abramson's conduct was not below the standard of care applicable to his activities.
The rule to be followed with regard to the defendant physician is that a medical specialist is required to exercise the degree of care and possess the degree of knowledge or skill ordinarily exercised and possessed by physicians within his medical specialty. The plaintiff who seeks to prove that a medical specialist failed to adhere to these standards of care or skill is not limited to expert medical testimony by witnesses practicing or familiar with the standards of care and skill within the defendant specialist's community or locality. Ardoin v. Hartford Accident and Indemnity Co., 360 So.2d 1331 (La.1978).
In this suit, plaintiff claimed that on June 13, 1974, he was treated by Dr. Abramson for stomach pains and, on the same day, he was admitted to East Ascension Parish General Hospital on orders of Dr. Abramson. Plaintiff's allegations as to defendant Abramson were that he negligently diagnosed the plaintiff's condition as appendicitis, negligently performed the surgery, and failed to obtain informed consent for the surgery performed.
Defendant Abramson answered that the plaintiff came to him on June 12, 1974, with lower abdominal pain of several days duration. After examination, Dr. Abramson felt that Mr. Babin showed signs of early acute appendicitis and had him admitted to the hospital. During the night, Abramson remained with the patient; and as his condition appeared to deteriorate, Dr. Abramson decided early the next morning that abdominal surgery was necessary. The doctor denied any negligence and asserted that he measured up to the appropriate standards for his profession and that he had obtained consent from the patient.
*852 To prove the negligence of Abramson, plaintiff relied upon his own testimony, that of his wife, that of the ambulance driver who carried Babin from defendant hospital to the hospital in Baton Rouge, a nephew who visited him the day after the operation at defendant hospital, a brother-in-law who visited him the day when plaintiff was transferred to the Baton Rouge hospital, a sister who visited the patient at the same time her husband did (day of transfer to Baton Rouge), and Babin's mother-in-law. The plaintiff also called Dr. Abramson on cross examination. The latter testified that he diagnosed the stomach pains as probable appendicitis, and the patient definitely had symptoms of a surgical abdomen; that when he made the incision, the appendix was slightly inflamed and was removed. The surgeon at that point thought that Babin had additional medical problems. He therefore explored into the abdomen, and found "a one to two inch mass, round mass, in his colon, in his large intestine, that looked like it was hard, firm, and almost appeared to be breaking through the bowel at that point." Dr. Abramson decided that an immediate colon resection was necessary. The doctor performed a right hemi-colectomy with ileo-transverse colostomy, a surgical procedure by which a mass in the intestines is removed and the intestines sewed back together. When medical problems developed, Babin was sent to a hospital where intensive care was available.
The lay witnesses mainly testified to how Mr. Babin was feeling and his apparent condition. They had no knowledge of the surgery itself. Plaintiff offered no expert witnesses to show that Dr. Abramson was negligent in his diagnosis or in his surgical procedures. The only medical testimony was that offered by the defendants: Dr. Thomas B. Flynn, the neurological surgeon who examined the plaintiff at the Baton Rouge hospital following cardiac arrest, and who indicated it was unlikely that the plaintiff sustained brain damage at that time; and, Dr. Richard A. Streb, the general practitioner who assisted Abramson in the surgery, and who testified to the manner in which the surgeon operated on Mr. Babin.
In any event, the record does not show that Dr. Abramson was negligent. There is no evidence to indicate any deviation from the Ardoin standard of care in his diagnosis, treatment of the patient, or performance of the surgery.
The principal issue raised by appellant is whether the trial judge properly instructed the jury on the legal principles of consent and informed consent.
The jury instructions given by the trial court read as follows:
"A physician or surgeon, upon undertaking the operation or treatment, is under the duty, in the absence of an agreement limiting the service, to continue his attendance after the operation or first treatment, as long as the case requires attention.
"The consent of a patient is a prerequisite to a surgical operation and a surgeon who performs an operation without his patient's consent, express or implied, is liable in damages for a battery. That rule extends to the performance of operations different in nature from that for which a consent was given. The rule is subject to exceptions in the event of an emergency requiring immediate action for the preservation of life or health of a patient under circumstances in which it is impossible or impracticable to obtain the patient's consent or the consent of anyone authorized to assume such responsibility.
"Express consent is not, however, always sacramental and under certain circumstances may be implied or presumed. Thus, a patient who voluntarily submits himself for treatment, relying entirely upon the surgeon's skill and care to decide for him what shall be done, gives a general consent by implication, at least, to such operations as may, in the surgeon's skill and professional judgment, be reasonably necessary.
"It is the nature of the patient-physician relationship that the exact agreements on the issue of consent are the exception rather than the rule."
*853 We have reviewed the instructions of the trial court in light of the allegations, the issues and evidence presented in the trial of this case. We find that they fairly and reasonably point up the issues presented by the pleadings and the evidence and provide correct principles of law for the jury's application to the facts. See Lambert v. Michel, 364 So.2d 248 (La.App. 3 Cir. 1978), writ denied, 366 So.2d 917 (La.1979). We hold that the instructions given by the trial judge were proper and did not deprive the plaintiff of a meaningful jury trial, and that they enabled the jury to reach a verdict which is fully supported by the evidence and the law. Hanks v. Drs. Ranson, Swan & Burch, Ltd., 359 So.2d 1089 (La. App. 3 Cir. 1978), writ denied, 360 So.2d 1178 (La.1978).
Even if a surgeon is not negligent in performing the surgery, he may still be liable for damages if the surgery performed was unauthorized. The rule to be followed is that consent of a patient, express or implied, is required prior to a surgical operation, and a surgeon who operates without such consent is liable in damages, except in case of an emergency requiring immediate surgery for preservation of life or health, under circumstances in which it is impractical to obtain the consent of the patient or someone authorized to assume such responsibility. Beck v. Lovell, M. D., 361 So.2d 245 (La.App. 1 Cir. 1978), writ denied, 362 So.2d 802 (La.1978).
A corollary to the rule of consent is the informed consent doctrine. Not only must a patient consent to an operation, but such consent must be an informed consent; that is, a physician has a duty to disclose all known information material to a patient's intelligent decision to undergo a particular operation or therapeutic procedure. The information which the physician has a duty to disclose includes the proposed diagnostic, therapeutic or surgical procedure contemplated, the material risks involved, and the alternatives, if any, available. Steele v. St. Paul Fire & Marine Insurance Company, 371 So.2d 843 (La.App. 3 Cir. 1979), writ denied, 374 So.2d 658 (La.1979); Parker v. St. Paul Fire & Marine Insurance Company, 335 So.2d 725 (La.App. 2 Cir. 1976), writ refused, 338 So.2d 700 (La.1976).
The facts show that in the early morning following plaintiff's admission to the hospital, his condition had changed sufficiently to where Dr. Abramson felt it was necessary to proceed to surgery. In the medical records of East Ascension General Hospital, he wrote his findings on "6/13/74" as follows:
"7:30/A.M. Definite rebound tenderness present now, guarding deep tenderness. Surgery will have to be done. The whole situation is peculiar and I will do a R paramedian incision."
Dr. Abramson felt at the time that the patient now had a "surgical abdomen," which is an acute condition of the abdomen in which there is tenderness, pain and muscle rigidity. Thus, Abramson, on June 13, recommended surgery for the patient, but at that time he was still uncertain as to the exact situation presented by the patient. Because of the symptoms, the physician was unsure as to whether he was dealing with an acute appendicitis, leaking appendix resulting in an abscess formation or a rupture, or whether he was dealing with an appendix in an abnormal position. Hence his note "The whole situation is peculiar..."
Consequently, the physician decided to make a right rectus incision instead of the usual type of appendectomy incision. The purpose of this incision, as explained by Abramson, was that in case he found something other than an appendix problem, he could extend the incision readily to handle any other problems he might encounter. Dr. Abramson described in his testimony what transpired at the surgery.
"Q. Now, when you entered the wound or the opening, whatwhat did you find?
A. When I entered into the abdominal cavity, I got to the area of the appendix, which wasI had a small incision and the appendix looked slightly inflamed at that time. The appendix was sticking right there and I removed the appendix; however, on examination of it, I wasn't completely *854 convinced that this was causing all of his problems and, therefore, I had further exploration of the abdomen, examined it further.
Q. Okay. You took the appendix out at that point?
A. Yes.
Q. And then you explored?
A. Yes.
Q. Now, during your exploratory surgery, what did you find?
A. I found about a one to two inch mass, round mass, in his colon, in his large intestine, that looked like it was hard, firm, and almost appeared to be breaking through the bowel at that point."
Dr. Abramson feared that this mass might represent a carcinoma, and thus performed resection of the colon with an end to end anastomosis.
Later a leak developed in the anastomosis, which resulted in Babin having a difficult post-operative course, and necessitated his transfer to the Baton Rouge General Hospital and re-operation by Dr. S. E. Field, a Baton Rouge physician. Though plaintiff had Dr. Field subpoenaed as a witness, he was not called as a witness, and the record is silent as to Dr. Field's findings.
With regard to the consent situation, Dr. Abramson testified that he had no suspicion that the mass he found in Mr. Babin's intestinal tract was present prior to his actually finding it after he cut Mr. Babin open. In fact, Dr. Abramson stated that this was the only time in his practice of medicine that he had ever had a situation of a mass in the colon presenting itself as "acute appendicitis," and that this condition is very rare. Plaintiff admitted that Dr. Abramson had his consent to perform an appendectomy on him. Plaintiff raises no issue that the risks of the appendectomy were not given him, and admits he signed the consent form for surgery to "R/O (rule out) Acute Appendicitis." The signed consent form gave Dr. Abramson permission to perform any "procedures as are considered therapeutically necessary on the basis of findings during the course of the said operation." The hospital records, especially the admission orders, the operative consent form and "Admission and Nursing Assessment Record" indicate "possible appendicitis" was the reason for Mr. Babin's admission to the hospital.
The question presented to the trial court on this issue was whether Dr. Abramson, upon discovery of this mass, should have performed the operation, or closed the patient, awakened him, told him what the doctor found, what the doctor suspected it was, then upon obtaining his consent to further surgery, re-anesthetized the patient and again performed the surgery. There is no evidence to show that had Dr. Abramson told Mr. Babin, under these circumstances, what the situation was, that the plaintiff would not have (nor would a reasonable man not have) consented to the surgery. Mrs. Babin did not arrive at the hospital until after the surgery began, so for all practical purposes, she was unavailable to consent to the further surgery.
Concerning the operation, Dr. Abramson testified:
"A. Following the removal of the appendix, I elected to explore or look into thehis abdominal cavity more, and upon further exploration, I found this mass in his colon and it was about a one to two inch mass, hard, firm mass that was present, and it actually was extending out as though it wasit was inflammation that seemed to be going outside the bowel, this hard mass. And at that time, because of this mass, I extended the incision to further explore the abdomen, which I did, and I felt that the possibility that this could be a carcinoma, which came to my mind very quickly, and that this was the best chance if we were going to do anything about it to do it now, that I went ahead and did a resection of this mass.
Q. All right. Could you look at that mass in the surgical field and tell for a matter of certainty what it was?
A. No, sir, I could not.
Q. What were the disadvantages at that time to just closing the patient up? *855 A. I don't believe it would have been good surgical procedure to do, and several reasons are, one, that if this was a carcinoma and you did close him up, this was the best chance we would have to so call get a cure for this man, by removing this thing. Secondly, this thingif this thing was going on to perforate, which could have burst a hole and drain into the abdominal cavity, we would have had what they call peritonitis, and you had a draining area of feces and all into the abdominal cavity. Another thing is, that to subject this man again to another anesthesia for a reoperation would be another problem that could occur, and I felt the best surgical judgment at this time was to do what I did.
Q. Dr. Abramson, we know what it is in retrospect. What would have happened had you left that cecal diverticulitis in the patient; what would have eventually happened?
A. My feeling is, the way this thing was developing and how big this mass was, and apparently getting the symptoms changed and gotten worse, there was the possibility this thing could have perforated or burst.
Q. The disadvantages ofyou said that it was the best chance to get a carcinoma, why is that?
A. Because if you are going to go after a cancer, the first time you are there is the best time to get it. No telling when you are going to have another chance to do this again, whether it's spread again, and while you are in there, if you are going toif you are going to go after a cancer, that's the time to do it.
Q. Doctor, have you, prior to this time, performed colon resections?
A. Yes, sir.
Q. Have you since that time performed colon resections?
A. Yes, sir."
A physician is not required to inform the patient of a remote or rare possibility, or an event which can not be reasonably anticipated. It is not required that the physician advise the patient as to every conceivable possibility and eventuality that may stem from that physician's treatment. Delaune v. Davis, 316 So.2d 7 (La.App. 1 Cir. 1975).
A physician's failure to disclose a possible danger is not a breach of duty on his part in the absence of a showing that the patient's consent would have been withheld if the patient had been informed of the danger. Percle v. St. Paul Fire and Marine Insurance Company, 349 So.2d 1289 (La. App. 1 Cir. 1977), writ denied, 350 So.2d 1218 (La.1977).
In Percle, the patient was faced with the decision of whether to undergo surgery to remove a possibly malignant growth from his face. The physician failed to disclose that there was a risk of injury to facial nerves and possibility of the severance of the parotid duct. The Court, after weighing the possible risks against the consequences of an untreated malignancy, concluded that a reasonable person aware of such a risk would have still undergone the surgery; thus, the liability of the physician was in that case based on his negligence in severing the duct; it was not grounded on any theory of lack of informed consent.
We believe that the instant case is analogous to Percle in that the plaintiff herein has not established that he would not have consented to the surgery had he been fully advised of the risks of an anastomosis.
On the question of the submission of interrogatories, the applicable provision is C.C.P. art. 1812, which provides:
"The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict.
"When the general verdict and the answers are harmonious, the court shall direct *856 the entry of the appropriate judgment upon the verdict and answers.
"When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may direct the entry of judgment in accordance with the answers, notwithstanding the general verdict, or may return the jury for further consideration of its answers and verdict, or may order a new trial.
"When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers or may order a new trial."
The interrogatories given by the trial judge are as follows:
"INTERROGATORIES
"1. Was the conduct of the defendant, Dr. Abramson, below the standard of care applicable to his activities?
 YES__________ NO X 
"2. Was the injury which plaintiff suffered caused by the conduct of the defendant, Dr. Abramson?
 YES__________ NO X 
"3. Did plaintiff suffer damage as a result of the conduct of the defendant, Dr. Abramson?
 YES__________ NO X 
"4. Was the conduct of the defendant, East Ascension Parish General Hospital, Inc. below the standard of care applicable to its activities?
 YES__________ NO X 
"5. Was the injury which plaintiff suffered caused by the conduct of the defendant, East Ascension Parish General Hospital, Inc.?
 YES__________ NO X 
"6. Did plaintiff suffer damages as a result of the conduct of the defendant, East Ascension Parish General Hospital?
 YES__________ NO X 
"7. What is the amount of damages?
 $___________________________"
We find that the interrogatories were proper under the circumstances of this case. The verdict and the answers to the interrogatories were harmonious. The trial judge gave adequate instructions regarding the interrogatories. The instant case is distinguishable from the case of Corceller v. Brooks, 347 So.2d 274 (La.App. 4 Cir. 1977), writ denied, 350 So.2d 1223 (La.1977), relied upon by the plaintiff. Corceller was a legal malpractice action where the plaintiff alleged several different claims, such as negligence, termination of a franchise, injunctive relief, breach of contract, etc. One of the interrogatories dealt with the defendant's negligence, and then the trial court posed the objectionable interrogatory:

"INTERROGATORY 6.
"Was plaintiff Joseph C. Corceller, Jr. guilty of contributory negligence and/or assumption of risk?
 YES X NO_____
"If your answer is `YES,' you will return a verdict for defendants.
"If your answer is `NO,' you will return a verdict for plaintiff, Joseph C. Corceller, Jr. and against defendants, find the amount of plaintiff's damages and return a verdict in that amount."
The appellate court, taking the facts and circumstances into consideration, stated:
"Though the trial judge in his charge instructed the jury to consider plaintiff's claims separately, the interrogatory did not define those claims to which contributory negligence and assumption of risk are responsive defenses. Absent this differentiation, the jury could not have known which of plaintiff's claims are subject to the defense of contributory negligence and assumption of risk and which of those claims are not."
The Court then continued:
"According to the Code of Civil Procedure and the jurisprudence, the trial judge has the discretion to submit a case to the jury on special interrogatories but is not required to do so. Nevertheless, in a matter involving a cause of action in *857 which several claims are asserted to which different defenses are responsive, the trial judge, in order to assist the jury in its deliberation, should direct interrogatories to the jury which would allow a separate jury finding on each claim and on the defense applicable to that claim.
"Accordingly, we conclude the trial judge erred in the instant case in failing to include an interrogatory defining those claims asserted by plaintiff to which contributory negligence is a viable defense and those claims to which this defense is not applicable."
Appellant also urges that the trial judge improperly charged the jury on the question of the liability of the defendant hospital. The record does not support this contention. The record does not reflect that counsel for plaintiff objected to the charges concerning the hospital. Haynes v. Baton Rouge General Hospital, 298 So.2d 149 (La.App. 1 Cir. 1974), writ denied, 302 So.2d 33 (La.1974). He objected to the failure of the trial court to give two special jury instructions regarding informed consent. As to the instructions given, he objected to the trial court's charge concerning consent.
Nevertheless, we set out the trial judge's instructions to the jury on the question of the hospital's liability as follows:
"Now, I will instruct you on the basic standard of care applicable to the conduct of the defendant, East Ascension Parish General Hospital.
"A hospital is bound to exercise a requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and facts of the case.
"The hospital, like all other employers in our society, may be held liable for the acts of negligence committed by its employees during the exercise of the functions for which they are employed. A patient is admitted to a hospital under an obligation, owed to him by the hospital and its employees, to provide such reasonable care and attention for his safety as his mental and physical condition, as known to the defendant or its nurses or other employees, may require.
"However, a hospital is not an insurer of a patient's safety, and the rules as to the care required are limited by the rule that no one is required to guard against or to take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen. The hospital is obligated to use reasonable care in the light of the requirements of the patient's known condition.
"Therefore, to recover against East Ascension Parish General Hospital, the plaintiff must prove by a preponderance of the evidence:
"1. The degree of care ordinarily provided by hospitals in the area to patients having the same known medical condition as the plaintiff;
"2. That one or more employees or the defendant East Ascension General Hospital failed to provide such care."
We find these charges are in substantial compliance with those developed by the jurisprudence. Bryant v. St. Paul Fire & Marine Insurance Company, 365 So.2d 537 (La.App. 3 Cir. 1978), writ denied, 367 So.2d 1184 (La.1979). The judge did not indicate a "community-standard" should be used to determine lack of proper care by the hospital.
Although the appellant argues in his supplemental brief that there was negligence on the part of the hospital and that the trial court erred in instructing the jury as to the proper standard of care for such an institution, the record convincingly shows that there was no liability on the part of the hospital. The only evidence presented to the jury which the plaintiff contended showed liability on its part was that the staff gave the patient sips of water *858 and cracked ice against the doctor's orders to give him "nothing by mouth." In response to this evidence, the hospital presented evidence which showed that that was done when there was a stomach pump on the plaintiff which would prevent any accumulation of fluids in his stomach or abdomen, or was done after the doctor's order had been cancelled. These issues were decided by the jury adversely to the plaintiff's position.
We have carefully reviewed and evaluated the record, and we find that there was no negligence on the part of East Ascension General Hospital. The hospital exercised the requisite amount of care toward Ivy Babin that his particular condition required. The factual findings of the jury in determining the issues of liability of the physician and the hospital in the instant case are supported by credible evidence in the record. We have thoroughly reviewed the evidence and under the particular facts and circumstances of this case, we find no manifest error in the jury's findings.
For the foregoing reasons, we affirm the judgment at appellant's costs.
AFFIRMED.